UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                              )
DAVID FRIEDMAN,               )
            Plaintiff,        )
                              )
      v.                      )
                              )
MICHAEL J. ASTRUE,            )   CIVIL ACTION NO.
                              )   1:10-CV-11397-PBS
            Commissioner of   )
            Social Security,  )
                              )
            Defendant.        )
_____)
```

**MEMORANDUM AND ORDER**

September 28, 2011

SARIS, U.S.D.J.

## I.  INTRODUCTION

Plaintiff David Friedman ("Friedman"), who suffers from
various physical and mental ailments including hepatitis C,
Crohn's disease and depression/anxiety, seeks review of the
decision denying his application for Supplemental Security Income
("SSI") payments under 42 U.S.C. § 405(g). The plaintiff argues
that: (1) the Administrative Law Judge ("ALJ") improperly
rejected the opinion of Friedman's treating therapist, Joseph
Szendro, M.Ed.; (2) the ALJ violated the treating physician rule
by failing to assign controlling weight to the opinion of
Friedman's treating physician, Thomas Capozza, M.D.; (3) the
ALJ's unfavorable credibility finding was not supported by
substantial evidence; and (4)the Commissioner of Social Security

("Commissioner") failed to sustain his burden of establishing that the plaintiff can perform other work in the national economy.

For the reasons set forth below, the Court **ALLOWS** Friedman's motion for remand, and **DENIES** the Commissioner's motion to affirm the decision.

## II. Facts

The administrative record contains the following facts. Friedman is a forty-four year old single male. (Tr. 37.) He was in prison for a total of twelve years between November 1989 and August 2007 as a result of three convictions for breaking and entering. (Tr. 147, 157.) He speaks English, earned a GED in 1993 while incarcerated at the Rhode Island Department of Corrections, and has worked part-time as an interior house painter. (Tr. 23, 38, 142-150.) Friedman lives with his girlfriend and their two children. (Tr. 37.)

In 1993, while incarcerated, Friedman began complaining of pain related to Crohn's disease and hepatitis C. (Tr. 248-407, 552-54.) Over time, he reported chronic abdominal pain, frequent trips to the bathroom, fatigue and weakness. (Tr. 248-407, 416, 552-54) Additionally, Friedman began treatment for anxiety and depression in 1997 at the Rhode Island Department of Corrections. (Tr. 223.)

## A. Physical Ailments

Friedman first reported pain related to Crohn's disease[1] and hepatitis C[2] at the beginning of his incarceration in November 1989. (Tr. 248-407, 552-54.)  Until his release from prison in 2007, Friedman was given regular medical testing to monitor the status of these ailments.

On January 4, 1995, after suffering from abdominal pain and rectal bleeding "on and off" for about one year due to his Crohn's disease, Friedman was diagnosed with a rectal fistula and underwent surgery. (Tr. 257-62.)  In September 1996, Friedman had a right-sided perirectal abscess and was referred to a gastrointestinal clinic.  (Tr. 276.)  On December 26, 1996, Friedman complained of increasing lower quadrant pain, but by January 9, 1997, he reported a marked decrease in pain.  (Tr. 623-25.)  The plaintiff felt "much better" since taking prescription Sulfasalazine. (Tr. 625.)  Although Friedman's abdominal pain would return a few months later, the pain subsided again after he stopped taking Interferon, a drug prescribed to

---

[1] Crohn's disease is "characterized by patchy deep ulcers that may cause fistulas, and narrowing and thickening of the bowel by fibrosis and lymphocytic infiltration, with noncaseating tuberculoid granulomas that also may be found in regional lymph nodes." *Stedman's Medical Dictionary* 597 (27th ed. 2000). "Symptoms include fever, diarrhea, cramping abdominal pain, and weight loss." *Id.*

[2] "Hepatitis C is the principal form of transfusion-induced hepatitis; a chronic active form often develops." *Stedman's Medical Dictionary* 808 (27th ed. 2000).

treat his hepatitis C. (Tr. 626, 266-67, 376.)  Friedman was

reportedly "doing well" and was "asymptomatic" as of August 13,

1997. (Tr. 628.) Almost one year later, on July 8, 1998, Dr.

Thomas Hunt concluded that Friedman had a "negative abdominal

exam"; he observed a normal gas pattern and soft tissue

structure. (Tr. 299.)

Dr. Aloysius Rho also found Friedman was "asymptomatic" and

"without too much pain" on March 24, 1999, despite Friedman's

complaints of tenderness around the left side of his rectum. (Tr.

304.)  At this point, Dr. Rho concluded both Friedman's Crohn's

disease and hepatitis C were "reasonably stable." Id.

Following Dr. Rho's examination, Friedman had two liver

biopsies while incarcerated as a result of his hepatitis C.  On

May 7, 1999, the biopsy revealed mild chronic activity.  (Tr.

305.)  The next biopsy in 2004 showed that his hepatitis C was at

stage 2-3 and grade 2 (Tr. 239.)

Prompted by increased complaints of pain relating to his

Crohn's disease, Friedman had a rectal biopsy on February 4, 2000

revealing a fissure, but no fistulas, abscesses, or inflammation.

(Tr. 633.)  On March 29, 2001, Friedman had a pelvic CT scan

showing a normal pelvis and abdomen. (Tr. 211-12.) Two months

later, on May 9, 2001, Dr. David Maddock, one of Friedman's

treating physicians, performed a colonoscopy and a biopsy showing

"[n]o cause for right lower quadrant pain, which does not seem

severe." (Tr. 214-15.) Dr. Maddock noted that if some inflammation existed, "the changes are very subtle if real." Id. One year later, on April 19, 2002, Dr. Maddock conducted an upper GI study revealing a small hiatus hernia and mild gastric reflux, but an otherwise negative study. (Tr. 217.) In early 2003, yet another colonoscopy, prompted by Friedman's complaints of rectal pain, uncovered "patchy colitis and maybe evidence of low grade Crohn's disease." (Tr. 219.) On the other hand, Friedman's CT scan in February 2003 was negative, showing an unremarkable bowel pattern, no evidence of a dominant mass, and no inflammatory reaction. (Tr. 556.) Again, in November 2005, Friedman's colonoscopy revealed a normal digital rectal exam, normal sphincter tone, no rectal lesions, normal prostate, and no anal lesions or abnormality. (Tr. 343.)

Friedman was released from prison in 2007 and within the year filed his application for benefits with the SSA. (Tr. 40.) His subsequent medical history is as follows. On December 26, 2007, Friedman complained of right lower quadrant pain, but reported that his bowel movements were stable. (Tr. 559.) Almost two weeks later, on January 8, 2008, Friedman visited the emergency room at St. Anne's Hospital citing fatigue primarily. (Tr. 416.) He was in no acute distress and denied fever, chills, nausea, vomiting, diarrhea, weight loss, and appetite

disturbance. (Tr. 415.) A CT scan showed abnormal thickening of the terminal ileum and a thick sigmoid wall. (Tr. 416.)

Also in early 2008, internist Dr. Vladimir Yufit conducted a consultative examination of the plaintiff. (Tr. 431.) Friedman reported daily abdominal pain, frequent bowel movements, and fatigue. Id. Dr. Yufit, however, noted that Friedman appeared to be a "well-developed, well-nourished, young man, not in distress, [and] very pleasant." (Tr. 432.) Dr. Yufit reiterated Friedman's prior diagnoses of chronic hepatitis C and chronic Crohn's disease. Id.

Another state-agency physician and a specialist in internal medicine, Dr. Mark Colb, completed a Physical Residual Functional Capacity Assessment ("RFC") later that month, on January 29, 2008, based on a paper examination of Friedman's medical records. (Tr. 442-50.) Dr. Colb concluded that Friedman was capable of occasionally lifting up to twenty pounds and frequently lifting up to ten pounds. (Tr. 444.) The doctor found that Friedman could both stand and/or walk and sit for six hours in an eight-hour workday, and that Friedman had unlimited ability to push and/or pull. Id. Additionally, Dr. Colb recorded that Friedman may occasionally climb, balance, stoop, kneel, crouch, and crawl; Friedman had no manipulative limitations or environmental limitations to working in extreme cold, extreme heat, wetness,

humidity, or working with noise, fumes, or hazards. (Tr. 445, 447.)

On May 28, 2008, Dr. Swaran Goswami completed another Physical RFC for the SSA. (Tr. 495-502.) Dr. Goswami noted identical findings to Dr. Colb's January 2008 assessment, five months earlier. At bottom, he found Friedman capable of performing light work. (Tr. 496.)

Meanwhile, in 2008, Friedman's treating physicians, Dr. Maddock and Dr. Thomas A. Capozza, and his primary care physician, Dr. Rajaratnam Abraham, conducted various medical tests to determine the root of Friedman's chronic fatigue and frequent bowel movements. Dr. Maddock, a gastroenterology and internal medicine specialist, performed a colonoscopy on January 16, 2008. (Tr. 437.) The terminal ileum biopsy revealed no diagnostic abnormalities. Id. The random colon biopsies revealed non-specific, mild chronic inflammation. Id. Dr. Maddock reported, generally, that Friedman had "done pretty well over time" with his Crohn's disease. (Tr. 562.) Dr. Capozza performed a liver biopsy on February 12, 2008, noting mild chronic hepatitis with inflamation grade 1/4 and fibrosis stage 0/4. (Tr. 493.) On April 17, 2008, Dr. Abraham reported that Friedman's hepatitis C prognosis was "good." (Tr. 478.) In June and September 2008, however, Friedman told Dr. Abraham that his bowel movements had increased from one per day to 4-5 per day for

3-4 days per week. (Tr. 571, 574.) Nevertheless, Friedman stated to Arbour Counseling Services, "I feel calm enough to do my job and not have my Crohn's acting up." (Tr. 558.)

Dr. Capozza, a specialist in gastroenterology, examined Friedman five times between February 12, 2008 and May 19, 2009. During that time, medical testing showed some improvement, but Dr. Capozza reported persistent abdominal pain. After the February 12, 2008 liver biopsy mentioned above, Dr. Capozza ordered an endoscopy on October 17, 2008 which revealed possible gastritis (inflammation of the stomach) and a single aphthous ulcer (canker sore) in the distal ileum "of unclear clinical significance." (Tr. 576.) Overall, Dr. Capozza noted, "the quality of the exam was good." Id. But, on November 26, 2008, Friedman visited Dr. Capozza for worsening rectal pain, and was reportedly "upset/angry" at discharge because the doctor would not prescribe narcotics for pain. (Tr. 655-656.) On January 14, 2009, Dr. Capozza noted that Friedman is "[d]oing well now" since starting on Cipro and that Friedman's "[p]ain in rectum resolved with conservative measures." (Tr. 653.) Dr. Capozza, however, increased Friedman's medication at that time as he was still plagued by chronic abdominal pain. (Tr. 654.) Four months later, Friedman reported daily diarrhea, but he reported improvement one month later at his next doctor's visit on May 18, 2009. (Tr. 648.) Dr. Capozza wrote that Friedman was "[d]oing better since

last visit" and that he had "a great benefit from Suboxone therapy." (Tr. 648.) In August 2009, Dr. Capozza stated that he had no medical evidence of active Crohn's disease, and that it was "well-controlled." (Tr. 646). Still, he noted chronic pain complaints. (Tr. 647.)

Dr. Capozza completed a Pain Questionnaire on December 10, 2009 stating that Friedman suffered from significant, severe pain. (Tr. 610.) In fact, Dr. Capozza indicated that the pain is of such severity as to preclude sustained concentration and productivity, which would be needed for full time employment on an ongoing sustained basis. Id. On the Medical Source Statement of Ability to Do Work-Related Activities (Physical), Dr. Capozza noted that Friedman can only "occasionally" lift up to ten pounds, "occasionally" carry up to ten pounds, and sit or stand for one hour at a time. (Tr. 611.) Dr. Capozza's form also indicates that Friedman can only use both feet "occasionally," and can only use his hands for "occasional" reaching, grasping, and pushing/pulling. (Tr. 612.) Additionally, Dr. Capozza claimed that Friedman can only "occasionally" climb stairs, balance, or kneel, and that he can only "occasionally" drive a car and work in humidity, extreme cold, or extreme heat. Id.

On January 27, 2010, Dr. Maddock performed Friedman's final examination before his ALJ hearing. (Tr. 661.) During that examination, Dr. Maddock performed a colonoscopy revealing

hemorrhoids and a scarred-looking terminal ileum, but an
otherwise unremarkable colon.  Id.

## B. Mental Ailments

In addition to the physical ailments enumerated above,
Friedman suffers from anxiety and depression.  He first received
treatment at the Rhode Island Department of Corrections beginning
in early 1997 and periodically thereafter until his release in
2007. (Tr. 223.)  On January 4, 1997, Friedman admitted feeling
"very anxious and stressed out" when speaking with a social
worker. Id.  The next day, Friedman reported that he had
difficulty sleeping and was anxious and forgetful.  (Tr. 224.)
As a result, Friedman was prescribed Desipramine, an anti-anxiety
medication. Id.  But by February 2, 1997 Friedman reported that
he stopped taking the medication and his panic and depression
symptoms persisted.  Id.  Friedman was then prescribed Paxil. Id.
 Again, on March 1, 1997, Friedman reported that he had stopped
taking the medication, so he was prescribed Buspar, another anti-
anxiety medication. Id.  Friedman later refused to increase his
Buspar prescription.  (Tr. 225.)

Several years later, on December 8, 2003, Friedman was
prescribed medication, including Klonopin, for "explosive
disorder."  (Tr. 229.)  On January 14, 2004, a psychiatrist at
Rhode Island Department of Corrections wrote that Friedman
"demand[ed] Klonopin" because his hands were shaking.  Id.

Notably, the psychiatrist speculated that his "[hand shaking] could be put on for my benefit." Id. Subsequently, on May 9, 2004, Friedman made a similar complaint about an anxious tremor. (Tr. 230.) The psychiatrist at the Rhode Island Department of Corrections recommended that Friedman continue taking prescription Elavil for his depression. Id. Once again, on July 4, 2004, Friedman reported that he had stopped taking Elavil because it made him feel "bad in the morning." (Tr. 233.)

By the end of 2004, Friedman showed improvement. On September 19, 2004, Friedman's mood was described as "stable, except for relative mild depressive symptoms related to losing job." Id. Likewise, on December 20, 2004, Friedman's mood was described as stable, despite ongoing thought disturbance. (Tr. 234.)

After Friedman's release from prison and following his SSA application filing, Friedman visited St. Anne's Hospital emergency room on January 8, 2008 for fatigue as well as possible depression. (Tr. 416.) As a result, Friedman underwent two consultative examinations at the direction of the SSA between January 2008 and July 2008. The plaintiff also attended counseling sessions at Arbour Counseling Services ("Arbour") between April 2008 and October 2008.

Steven J. Hirsch, Ph.D., conducted the first consultative psychological evaluation of Friedman's overall functioning on

January 25, 2008. (Tr. 438.) Such an evaluation was deemed
necessary because of the plaintiff's history of polysubstance
abuse, the possibility of depression, characterological disorder,
and somatic problems. Id. During the evaluation, Friedman stated
that he had never seen a psychiatrist in the past and had never
received any type of inpatient psychiatric treatment. (Tr. 439.)
Dr. Hirsch reported that Friedman's hygiene skills were "good,"
that Friedman was "alert, cooperative and oriented in three
spheres (person, place, and time)," and that he did not appear to
be in any physical discomfort. Id. Dr. Hirsch also noted that
Friedman had functional coordination, clear speech, functional
vocabulary skills, and functional memory for past and recent
personal events. Id. The plaintiff was "able to focus,
concentrate and attend to questions presented," and he was able
to correctly answer questions related to cognitive skill. (Tr.
439-40.) Friedman's affect was appropriate, he was not anxious,
and his frustration tolerance was good. (Tr. 440.)

In terms of Friedman's social/emotional functioning, Dr.
Hirsch noted Friedman's ability to do daily household chores and
manage his own finances. Id. He stated that he had walked from
his home to Dr. Hirsch's office. (Tr. 439.) In fact, Dr. Hirsch
reported that Friedman's ability to sit, stand, and bend "appears
to be quite functional." (Tr. 441.) Friedman also had a valid

driver's license and was found capable of taking public transportation independently. (Tr. 440.) Friedman stated that he had no difficulty sleeping and got along well with others. Id. He also denied having suicidal or homicidal thoughts. (Tr. 441.) Accordingly, Dr. Hirsch reported that Friedman is "not experiencing symptomatology associated with posttraumatic stress disorder" or "clinical anxiety or depression." (Tr. 440-41.)

On July 21, 2008, Friedman was referred to Dr. Mark Sokol for a second consultative mental examination. (Tr. 504-09.) At that time, Friedman stated that he was able to dress, bathe, groom, cook, prepare foods, perform general cleaning and laundry, shop, and manage his money independently. (Tr. 507.) Friedman was cooperative and responsive to questions, adequately groomed, and his gate, posture, and behavior were normal. (Tr. 506.) Dr. Sokol noted that Friedman "is able to follow and understand simple directions and instructions and perform simple rote tasks under ordinary supervision." (Tr. 507.) Friedman's recent and remote memory skills were intact and his intellectual functioning was in the high average range. (Tr. 506.) Dr. Sokol found, however, that Friedman's ability to maintain attention and concentration for job-related tasks, as well as his capacity to perform job tasks consistently, were both mildly impaired. (Tr. 507.) His ability to maintain concentration may suffer, in part, because of the memory of his sister's death, his obsession with

breaking and entering into buildings, and chronic fatigue. (Tr. 505.) Dr. Sokol assessed Friedman as having a Global Assessment of Functioning, GAF, score of 55. (Tr. 508.)

After Dr. Hirsch's and Dr. Sokol's consultative examinations, Dr. Sumner Stone reviewed the evidence of the record and assessed Friedman's mental RFC on August 9, 2008 and again on September 9, 2008. (Tr. 512-25.) In August, Dr. Stone concluded that Friedman's functional limitations were mild. (Tr. 522.) Upon a second look in September, Dr. Stone again found Friedman's mental impairments were non-severe. (Tr. 535.)

Also during 2008, Friedman sought treatment at Arbour Counseling Services. On April 7, 2008, Mr. Joseph Szendro, M.Ed., Friedman's treating therapist, conducted an initial clinic evaluation. (Tr. 466.) Friedman's presenting problems were listed as chronic anxiety, fatigue, and intrusive thoughts about family tragedies, specifically the memory of his three-year-old sister's hit and run accident. Id. Friedman was diagnosed with Depressive Disorder and PTSD. (Tr. 472.) Friedman was given a current GAF score of 41. Id.

Two weeks later, on April 21, 2008, Arbour performed a psychiatric evaluation of Friedman. (Tr. 526-528.) Friedman stated that he was not depressed, but always worrying. (Tr. 526.) Friedman denied suicidality and distractability. Id. Friedman's behavior was noted as amiable and cooperative. (Tr.

14

528.) He would later report agitation, irritability, and anxiety in June of that year. (Tr. 531.) But by July, Friedman reported feeling calmer. (Tr. 532.)

Friedman attended counseling sessions at Arbour with Mr. Szendro and Danielle Federov, RNCS, between April and November of 2008. (Tr. 530, 558, 579-88, 605-09, 640-41, 676-97.) More than a year later, Mr. Szendro completed questionnaires dated November 2009 and January 2010, where he opined, for the first time, that Friedman's psychiatric impairments "in and of themselves preclude him from engaging in gainful employment." (Tr. 602-04, 639.) On the Affective Disorder Questionnaire, Mr. Szendro stated numerous depressive and manic symptoms that resulted in marked restrictions of Friedman's ability to carry out daily activities and maintain concentration, persistence, or pace. (Tr. 602.) Mr. Szendro also noted extreme restrictions in Friedman's ability to maintain social functioning and moderate to extreme limitations in his ability to perform mental work-related areas of functioning. (Tr. 604-05.)

### III. PROCEDURAL HISTORY

Friedman protectively applied for SSI on October 11, 2007 alleging an inability to work since January 1, 1990 because of debilitating symptoms from Crohn's disease, hepatitis C, and post-traumatic stress disorder ("PTSD") related anxiety and depression. (Tr. 11, 13, 123-29, 143.) The Social Security

15

Administration denied the claim initially and on reconsideration. (Tr. 70-71.)  Friedman then requested a hearing before an ALJ, which was held before Judge Barry H. Best on February 25, 2010. (Tr. 33-69.)  The hearing included testimony by the plaintiff, David Friedman, and a vocational expert, Edward Kolandra. Id.

When questioned about his job history in the last fifteen years, Friedman testified to working as a full-time interior house painter in 1997, between prison terms, and then again as a part-time interior house painter for his friend 1-2 days per week in 2007 after his release. (Tr. 39.)  Friedman testified that he struggled to keep pace because he was always running to the bathroom, sometimes as many as ten trips per day, but acknowledged that it doesn't happen all the time - - only when it flares up. (Tr. 39-40, 42, 60.)  Furthermore, Friedman testified that he cannot maintain full-time employment because of severe pain, chronic fatigue, and a fear of being around people. (Tr. 42-43.) Friedman admitted that he has a "hard time" accepting instructions from someone other than a friend; he gets angry and paranoid as a result. (Tr. 56-57.)  Friedman speculated that this was a result of his jail time. (Tr. 57.) As always, Friedman denied any suicidal thoughts. (Tr. 58.) He identified Dr. Capozza as his treating physician for his hepatitis C and Crohn's disease and Mr. Szendro as his bi-weekly therapist at Arbour. (Tr. 43.) At the time of the hearing, the plaintiff was taking four

medications - Asacol and Entocort for his Crohn's disease, Seroquel for both his anxiety and bipolar disorder, and Valium for just the anxiety. (Tr. 642.)

Friedman described his daily tasks as mostly household chores - arising at 5:45 am, helping his son prepare for school, driving his girlfriend to work, driving his son and nephew to school, vacuuming, washing the dishes, taking out the trash, and occasionally walking to the store, which is five minutes away - resting between tasks. (Tr. 48.) He reported needing to lie down for at least one hour, four times a day. (Tr. 53) When working as an interior house painter, Friedman spends about half an hour at a time on his feet; otherwise he sits or kneels as he paints baseboards. (Tr. 50.)  The heaviest item Friedman testified to lifting on the job was a gallon of paint to pour into a tray. Id.

Edward Kolandra, the vocational expert, testified that Friedman could not return to his past work as an interior house painter given his limitations. (Tr. 63-64.) On the other hand, Kolandra testified that the plaintiff could perform light and sedentary unskilled work activities such as that of a "small parts assembler . . . hand sewer . . . maid . . . security surveillance monitor . . . jewelry stringer . . . [and] carding machine operator." (Tr. 64-65.)  Importantly, Kolandra claimed that these jobs typically permit unscheduled work breaks every two hours and an additional thirty or sixty minute lunch. (Tr.

65.)

Following this hearing, on March 25, 2010, the ALJ denied
the plaintiff's claim for benefits and concluded that Friedman
has not been "disabled" within the meaning of the Social Security
Act during the time of his application. (Tr. 23-24.)  The ALJ
found that Friedman had not engaged in substantial gainful
activity since the date of his application on October 11, 2007.
(Tr. 13.)  He agreed that the medical evidence established that
Friedman suffers from the severe impairments of Crohn's disease,
hepatitis C, and depression/anxiety, but they do not meet or
equal any of the "Listing of Impairments" necessary to obtain
benefits, despite their "more than minimal impact on Friedman's
ability to perform basic work activities." (Tr. 13-14.) Thus, the
ALJ found Friedman capable of performing a wide range of
unskilled, light work, even though he lacks the residual
functional capacity necessary to perform his past work. (Tr. 23,
15.)  Under the Social Security Regulations, light work involves
lifting twenty pounds occasionally, lifting or carrying up to ten
pounds frequently, and standing/walking or sitting for at least
six hours of the eight-hour workday. (Tr. 21.)  The ALJ found
that the plaintiff's ability to maintain concentration was
sufficient to perform simple work tasks throughout an eight hour
workday, with short breaks every two hours, and he concluded that

Friedman was able to occasionally interact with the public, coworkers, and supervisors on a work-related basis. (Tr. 15.)

In making this finding, the ALJ concluded that Friedman's allegations concerning the intensity, persistence, and limiting effects of his ailments were not entirely credible in light of the plaintiff's "extensive" range of daily activities and the evidence on the record. (Tr. 20-21.)  The ALJ assigned limited weight to the RFC assessments of Joseph Szendro, Friedman's treating therapist, and Dr. Thomas Capozza, Friedman's treating physician, because they appeared more restrictive than supported by the evidence. (Tr. 18, 21.)  Instead, the ALJ relied upon the treatment notes of another treating physician, Dr. Maddock, Friedman's primary care physician, Dr. Abraham, and three consultative examining sources, Dr. Steven J. Hirsch, Dr. Mark D. Sokol, and Dr. Vladimir Yufit. (Tr. 21-23.)

The Decision Review Board ("DRB") did not complete its review of Friedman's claim within the time period allotted, rendering the ALJ's decision final, subject to judicial review. (Tr. 1-2.); see 20 C.F.R. § 405.420(a)(2).

## IV. STANDARD

### A. Disability Determination Process

To be eligible for Social Security disability benefits, an individual must be unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An impairment is only disabling if it "results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." § 423(d)(3).

The Commissioner has developed a five-step sequential evaluation process to determine whether a person is disabled. See 20 C.F.R. § 404.1520(a)(4); see also Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 6-7 (1st Cir. 1982). Step one considers the claimant's work activity – if the claimant is engaged in "substantial gainful activity," then they are not disabled. § 404.1520(a)(4)(i). Alternatively, if the claimant is not so engaged, the decisionmaker proceeds to step two, which determines whether the claimant has a medically severe impairment. See § 404.1520(a)(4)(ii); see also Bowen v. Yuckert, 482 U.S. 137, 140-41 (1987). To establish a severe impairment, the claimant must "show that [he] has an 'impairment or

combination of impairments which significantly limits . . . the abilities and aptitudes necessary to do most jobs.'" <u>Bowen</u>, 482 U.S. at 146 (quoting 20 C.F.R. §§ 404.1520(c), 404.1521(b)).

If the claimant successfully establishes a severe impairment, the third step determines "whether the impairment is equivalent to one of a number of listed impairments that . . . are so severe as to preclude substantial gainful activity." <u>Id.</u> at 141 (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). If so, the claimant is conclusively presumed to be disabled. <u>Id.</u> If not, the fourth step evaluates whether the impairment prevents the claimant from performing his past work. <u>Id.</u> A claimant is not disabled if that claimant is able to perform his past work. <u>Id.</u> (citing 20 C.F.R. §§ 404.1520(e), 416.920(e)). If a claimant cannot perform this work, the burden shifts to the Commissioner on the fifth step to prove that the claimant "is able to perform other work in the national economy in view of [the claimant's] age, education, and work experience." <u>Id.</u> at 142. If the Commissioner fails to meet this burden, the claimant is entitled to benefits. <u>Id.</u>

### B. Standard of Review

In reviewing SSDI determinations, district courts do not make <i>de novo</i> determinations. <u>Lizotte v. Sec'y of Health & Human Servs.</u>, 654 F.2d 127, 128 (1st Cir. 1981). Instead, the Court "must affirm the [ALJ's] findings if they are supported by

substantial evidence." <u>Cashman v. Shalala</u>, 817 F. Supp. 217, 220 (D. Mass. 1993)(citing 42 U.S.C. § 405(g)); <u>see also</u> <u>Rodriguez Pagan v. Sec'y of Health & Human Servs.</u>, 819 F.2d 1, 3 (1st Cir. 1987).

In addition to considering whether the ALJ's decision was supported by substantial evidence, a court must consider whether the proper legal standard was applied. "Failure of the [ALJ] to apply the correct legal standards as promulgated by the regulations or failure to provide the reviewing court with the sufficient basis to determine that the [ALJ] applied the correct legal standards are grounds for reversal." <u>Weiler v. Shalala</u>, 922 F. Supp. 689, 694 (D. Mass. 1996) (citing <u>Wiggins v. Schweiker</u>, 679 F.2d 1387, 1389 (11th Cir. 1982)).


**V. DISCUSSION**

Friedman contends that the ALJ's residual functional capacity (RFC) assessment that Friedman was capable of light, unskilled work was not supported by substantial evidence. He argues that the ALJ erred in several ways - by not assigning controlling weight to the opinion of Friedman's treating physician, Dr. Capozza, by giving little weight to the opinion of his therapist, Mr. Szendro, and by not properly considering Friedman's own subjective complaints of pain. This case presents a close question. Because the weight given to the treating

physician's medical opinion is most significant to this review, I
begin with that issue.

## A. Plaintiff's Physical Limitations

Friedman argues that the Commissioner's decision should be
reversed because the ALJ violated the "treating physician rule"
by failing to accord controlling weight to Dr. Capozza's opinion
which states that Friedman's physical impairments were disabling.
Dr. Capozza reported, among other things, that Friedman suffers
from "severe" pain, and that he is incapable of stooping,
crouching, or crawling, and cannot be exposed to dust, odors,
fumes, of pulmonary irritants. (Tr. 21.)

A treating source is defined by 20 C.F.R. §§ 404.1502,
416.902 as a patient's own physician, psychologist, or other
acceptable medical source who has provided medical treatment in
an ongoing way. A treatment provider's opinion is entitled to
controlling weight if the "opinion on the issue(s) of the nature
and severity of [the claimant's] impairment(s) is well-supported
by medically acceptable clinical and laboratory diagnostic
techniques and is not inconsistent with the other substantial
evidence in [the] case record." § 404.1527(d)(2); see also Castro
v. Barnhart, 198 F. Supp. 2d 47, 54 (D. Mass. 2002). Generally,
treating sources are afforded more weight because they are the
medical provider "most able to offer a detailed, longitudinal
picture of the claimant's medical impairment(s)." §

404.1527(d)(2). When a treating source's opinion is not given controlling weight, the ALJ must then determine the amount of weight based on factors that include the length of the treatment relationship, the nature and extent of the source's relationship with the applicant, whether the source provided evidence in support of the opinion, whether the opinion is consistent with the record as a whole, and whether the source is a specialist in the field. § 404.1527(d). The ALJ, in his opinion, must give "good reasons" for the weight he ultimately assigns to the treating source opinion. Id.

The ALJ rejected Dr. Capozza's opinion because he deemed it inconsistent with Friedman's statements at the hearing and with the record as a whole. The ALJ does rely on the treating sources, Drs. Capozza and Maddock, who "comprise a recent longitudinal record of treatment of approximately three years and even going back as far as 2001." (Tr. 21.) In his view, these records indicate that "the claimant is able to manage his Crohn's disease and hepatitis C with medication and still perform basic work activities." Id. However, he gave Dr. Capozza's opinion with respect to his pain issues and residual functional capacity "limited evidentiary weight" because it was inconsistent with the evidence on record, including the testimony of the plaintiff.

To start, the Court must examine whether there is a significant inconsistency between Dr. Capozza's assessment and

Friedman's description of his work activity. The ALJ concluded
that the claimant engaged in "daily work as a painter." (Tr. 21)
However, the claimant said:

> Yeah.  Well, there's painting.  The guy, when I first
> got out in '07, around a yea later it's a friend of
> mine.  I asked him if he had any work.  He hired me.  I
> started work for him probably right away he noticed
> that I wasn't keeping up, I was running to the bathroom
> all the time.  I told him what I had, the Crohn's
> Disease, and he told me that if I kept it up he
> couldn't use me.  I tried keeping up with it, I
> couldn't.  I needed to be near a bathroom all the time.
> And he let me go after about two months.  And basically
> after that, probably six months, I was not working,
> doing nothing.  And I'd call him up, ask him if he had
> anything because I'd be at home like going out of my
> mind bored. I'd start thinking of illegal things again,
> which I didn't want to go back. So I'd call him, ask
> him if he had anything.  Most of the time he said no.
> But then my, maybe last year at the end towards, he's a
> friend of mine.  He didn't want to see me go back to
> jail so he'd give me a day a week, probably five hours,
> maybe six hours. (Tr. 39.)

Friedman's work as an interior house painter was sporadic –
sometimes one day per week, sometimes one day per month. (Tr. 39-
40.) He testified that chronic abdominal pain and trips to the
bathroom prevented him from working consistently. (Tr. 42-43.)
In fact, Friedman claimed that when his Crohn's disease flared
up, he would need to run to the bathroom up to ten times per day.
(Tr. 59.)  Although such a severe flareup was not reflected in
the medical records, his records did show repeated bouts of
diarrhea and 4-5 bowel movements per day.  (Tr. 648, 571, 574.)
This testimony of pain and frequent diarrhea is consistent with
Dr. Capozza's December 2009 assessment.  Friedman testified that

he only calls his friend for jobs on days he feels healthy enough to work. (Tr. 47.) Thus, Dr. Capozza's opinion that Friedman is incapable of maintaining a full-time position is consistent with Friedman's testimony that he worked for about 5-6 hours a week or a month – not daily.

The ALJ also relied on the fact that plaintiff's "extensive range of daily activities, in particular, his ability to drive a car and work, is clearly inconsistent with his allegations of disability." (Tr. 20). Friedman testified that he consistently arose at 5:45 a.m. each morning, dressed and bathed himself, prepared his son and nephew for school, drove the children to school and his girlfriend to work, shopped, prepared food, kept up with household chores, used public transportation, and managed his own finances. (Tr. 507.) But, Friedman also testified that such activity would exhaust him, making necessary several naps throughout the day.

In a similar case having to do with another sufferer of active Crohn's disease, this district court has stated "limited activities do not contradict the impact of [the] disease on [the plaintiff's] life . . . '[d]isability does not mean that a claimant must vegetate in a dark room excluded from all other forms of human and social activity.'" Rohrberg v. Apfel, 26 F. Supp. 2d 303, 310 (D. Mass. 1998)(quoting Waters v. Bowen, 709 F. Supp. 278, 284 (D. Mass. 1989)). In Rohrberg, the court further

noted that the plaintiff carefully chose when to undertake her activities, which often consisted of two hours of morning tasks, to avoid pain. Id. at 311. As a result, her activities did not reflect the substantial and sustained activity needed for gainful employment. Id.

Dr. Capozza's medical opinion about Friedman's pain is supported by his treatment notes taken as a whole. Since taking Friedman on as a patient, Dr. Capozza repeatedly noted Friedman's subjective complaints of abdominal pain. (Tr. 143, 485, 549, 589, 600, 646, 653.) His notes contain a laundry list of medication - Ascol, Entocort, Seroquel, Valium, Cipro, Lidocaine, Suboxone therapy, Naproxen - indicating that Friedman's symptoms were difficult to manage. (Tr. 598, 600, 646, 648, 649, 653). And he ordered a number of tests to determine the root of Friedman's chronic pain, including an endoscopy (which revealed possible gastritis and an aphthous ulcer), a colonoscopy, and several biopsies (revealing hemorrhoids and "scarred-looking terminal ileum."). (Tr. 661, 664-75.) At one point, Dr. Capozza even reported that he could not consider treating Friedman's hepatitis C until the pain derived from the patient's Crohn's disease was properly controlled. (Tr. 646-47.) While Dr. Capozza's notes demonstrate that the Crohn's disease was under control and had improved (Tr. 21, 598, 646.), they also suggest a history of pain.

Courts have pointed out that it is particularly important to examine the doctor's treatment notes as a whole for Crohn's disease sufferers because it is widely understood to be a highly unpredictable disease with flare-ups. See Hunt v. Astrue, No. 10-CV-199, 2011 WL 1226029, at *5-6 (D. Me. March 29, 2011)(holding that the ALJ erred in disregarding the unpredictable nature of Crohn's disease and the treating physician's warnings of problematic flareups.); Anderson v. Sec'y of Health & Human Servs., 634 F. Supp. 967, 972 (D. Mass. 1984)(holding that in assessing plaintiff's medical reports on her Crohn's disease,"[i]t is not reasonable to rely arbitrarily on portions of a medical report while simultaneously ignoring the spirit of the report.")

The ALJ relied on other medical evidence of record, notably, the consulting SSA physicians who found Friedman capable of light work in early 2008. For example, the ALJ noted that consultative examining source, Dr. Yufit, found Friedman "not in distress," and he weighed heavily the opinions of Drs. Colb and Goswami, both of whom found Friedman capable of light lifting; extended sitting, standing or walking; and without manipulative limitations or environmental limitations to cold, wetness, noise or fumes. However, Dr. Capozza evaluated Friedman at different time periods and over a longer period of time - almost two years. When there is a significant gap between evaluations, the treating

source's evaluation is not undermined by the earlier consultative evaluation. See Soto-Cedeno v. Astrue, 380 Fed. Appx. 1, *3 (1st Cir. 2010)(holding that two evaluations did not conflict when one and a half years passed between them).

In light of the foregoing, the court concludes that the treating physician's opinion should have been awarded more than limited weight in making Friedman's disability determination. Dr. Capozza, a gastroenterology specialist, began treating Friedman in December 2007 and saw him five times in the following two years. He was intimately involved in managing Friedman's symptoms during the time period of his disability application. Moreover, one of the key "inconsistencies" on which the ALJ relied was in error because Friedman did not have a history of working daily as a painter. Although the consulting physicians came to different conclusions, their opinions were over a year earlier. Thus, under § 404.1527(d), the regulatory factors relating to the length, nature, and extent of the treatment relationship as well as doctor speciality support giving substantial weight to Dr. Capozza's opinion.

## B. Pain

The plaintiff asserts that the ALJ erred when he found that Friedman's testimony concerning his severe pain and fatigue was not completely credible.

In evaluating subjective complaints of pain, the ALJ must

first decide whether there is a "clinically determinable medical impairment that can reasonably be expected to produce the pain alleged." <u>Avery v. Sec'y of Health & Human Servs.</u>, 797 F.2d 19, 21 (1st Cir. 1986).  The ALJ must then "evaluate the intensity and persistence of [the claimant's] symptoms so that [it] can determine how [the] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c).  The regulations acknowledge that a person's symptoms, expressed in their subjective complaints of pain, may be more severe than the objective medical evidence suggests. <u>See</u> 20 C.F.R. § 404.1529(c)(3).  Thus, the regulations provide six factors (known as the *Avery* factors) to consider when a claimant alleges pain: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness and side effects of any medication taken to alleviate the pain or other symptoms; (5) treatment to relieve pain; and (6) any functional restrictions. <u>See</u> 20 C.F.R. § 404.1529(c)(3); <u>see also</u> <u>Avery</u>, 797 F.2d at 29.  The ALJ's credibility determination is entitled to deference as long as the ALJ makes specific findings as to the relevant evidence considered in deciding whether to believe the plaintiff. <u>Frustaglia v. Sec'y of Health & Human Servs.</u>, 829 F.2d 192, 195 (1st Cir. 1987); <u>DaRosa v. Sec'y of Health and Human Servs.</u>, 803 F.2d 24, 26 (1st Cir. 1986).

The ALJ failed to adequately consider Friedman's subjective complaints of pain under the _Avery_ factors in making his credibility assessment.  In the decision, the ALJ focused primarily on the first factor, Friedman's daily activities, but he was mistaken about the frequency of Friedman's work as a painter. (Tr. 46.)  The ALJ did not consider the intensity of the abdominal pain and fatigue and did not address the side effects of the medications (i.e., fatigue) for the Crohn's disease.  To be sure, he inquired whether frequent unscheduled bathroom breaks would preclude Friedman from gainful employment, but he excluded from the inquiry the important fact that these urgent bathroom trips are often accompanied by severe pain. (Tr. 65.)  As such, the case must be remanded for a full consideration of the _Avery_ factors.

## C. Plaintiff's Mental Health

Another challenge is based on the ALJ's decision to give limited evidentiary weight to the mental health opinion of Friedman's therapist, Joseph Szendro.  After careful review of the record and the ALJ's decision, the Court concludes that substantial evidence supported the ALJ's conclusion on this matter.

This challenge must be analyzed under the framework provided in Social Security Ruling 06-03p, which grants the ALJ wide discretion in weighing a therapist's opinion. _See_ SSR 06-03p,

2006 WL 2329939 (Aug. 9, 2006). As both parties acknowledge in their briefs, a therapist is not among the "acceptable medical sources" listed in the Social Security Regulations. <u>See</u> 20 C.F.R. §§ 404.1513(a), 416.913(a). Instead, the label of "acceptable medical source" is limited to licensed physicians and psychologists. <u>Id.</u> As a result, Mr. Szendro's opinion did not deserve "controlling weight," and the ALJ was only constrained by the duty to reach a conclusion supported by substantial evidence in the record. *See* 20 C.F.R. § 416.927(d)(2) (stating that if a medical source opinion is inconsistent with the administrative record, it should be afforded less weight). Still, evidence may come from all medical sources in the record, whether the source is "acceptable" or not. <u>See</u> <u>Alcantara v. Astrue</u>, 257 Fed. Appx. 333, 334-35 (1st Cir. 2007)(citing 20 C.F.R. §§ 416.913(d); 416.929(c)(3)). The opinions of treating non-acceptable medical sources are useful "to show the severity of the individual's impairment(s) and how it affects the individual's ability to function." <u>Id.</u>

Mr. Szendro opined in December 2009 that Friedman's degree of restriction was "marked" in both activities of daily living and in maintaining concentration, persistence, or pace; his degree of restriction was "extreme" in social functioning with repeated episodes of decompensation. (Tr. 22.) The ALJ found that such an assessment presented inherent inconsistencies within

the record, undermining Mr. Szendro's credibility.  The
inconsistencies discussed are, indeed, important shortcomings.

First, the ALJ found Mr. Szendro's opinion conflicted with
the plaintiff's own testimony regarding his daily functional
abilities. (Tr. 22.) Friedman testified to completing a variety
of household chores, including driving, shopping, and cleaning.
(Tr. 48-49.) He also admitted to sporadic work as a house
painter.  Although Friedman spoke extensively about his physical
limitations, he did not likewise complain of mental problems and
the record shows that Friedman repeatedly failed to take his
medication. (Tr. 224, 225, 233.)  The ALJ reasonably found that
this behavior suggests greater mental competence than Mr. Szendro
believes possible when he reported Friedman's degree of
restriction "marked" in both activities of daily living and in
maintaining concentration, persistence or pace.

Second, the ALJ identified an undeniable inconsistency
between Mr. Szendro's assessment and that of Dr. Steven Hirsch,
the consultative examining source and clinical psychologist (an
"acceptable medical source").  In January 2008, Dr. Hirsch
reported that Friedman exhibited no symptoms of depression or
anxiety. (Tr. 439.) He also noted that Friedman had functional
coordination, clear speech, and functional vocabulary skills; the
plaintiff was "able to focus, concentrate and attend to questions
presented," and he was able to correctly answer questions related

to cognitive skill.  (Tr. 439-440.)  Dr. Hirsch's findings were bolstered by the similar reports of other state agency physicians, including psychologist, Dr. Sokol's July 2008 report. (Tr. 504-09.)

This Court does not find persuasive the ALJ's rationale that Friedman's subjective reports of mental disturbance are suspect simply because of his failure to seek treatment from a physician (psychologist or psychiatrist) for his mental health issues. (Tr. 20-21.) Case law on this matter suggests that the lack of *all* medical treatment or only irregular medical treatment can undermine the credibility of complaints of such pain or mental disturbance. See Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991)(viewing gaps in medical treatment as "evidence" that claimant's pain was not as severe as alleged); Perez Torres v. Sec'y of Health & Human Servs., 890 F.2d 1251, 1255 (1st Cir. 1989)(finding that lack of treatment supported ALJ's nonsevere finding).  Here, however, Friedman sought mental health treatment from a therapist and nurse practitioner consistently.  These health care providers supplied both counseling and medication, which to the lay person would suffice.  Even the Social Security Regulations, state that "[w]ith the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not 'acceptable medical sources,'" have "increasingly assumed a

greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists" and their opinions, "are important. . ." SSR 06-03p.

Still, in light of other factors, the ALJ did not err in granting little weight to Mr. Szendro's opinion given that he is not an acceptable medical source, that his position is called into question by other record medical evidence, and that the ALJ adequately explained his reasoning.

### D. Establishing Other Work in National Economy that Plaintiff Can Perform

I turn to the ALJ's conclusion that Friedman was capable of performing a significant number of jobs in the national economy, other than house painting. (Tr. 23-24.) On this matter, the ALJ stated that he primarily relied on the advice of the vocational expert (VE). During the hearing, the ALJ asked the VE, who had previously reviewed the record and heard the plaintiff's testimony, to consider whether gainful employment was possible for someone with Friedman's background, who could perform light unskilled work, and under the following conditions:

> . . . [he] would be precluded from work at unprotected heights or work with dangerous machinery or driving on motor equipment on the job; he's also . . . limited in dealing with the public; he could work with the public on an occasional basis provided that the interaction was limited to handoff of products or materials or exchange of non-personal work related information; he could work in the presence of coworkers, but not work in a work team where ongoing work-related interaction is frequent or continuous or physically close; he could interact with coworkers on a casual or social

basis up to occasionally; and he could work with
supervisors on an occasional basis, not where
interaction, monitoring is frequent or continuous and
physically close. (Tr. 63.)

The VE concluded that Friedman was capable of performing a
number of light sedentary jobs, including small parts assembler,
security surveillance monitor, jewelry stringer, and carding
machine operator. (Tr. 64-65.)  Friedman, however, argues that
this hypothetical question wrongly failed to specify that the
individual needed to be near a bathroom, and suffered from
fatigue and other limitations found by Dr. Capozza and Mr.
Szendro.

This argument is now moot in light of the Court's decision
today, remanding the case to the ALJ for reconsideration of
certain factual findings - specifically, the weight afforded
Friedman's treating physician, Dr. Capozza's opinion and
Friedman's subjective complaints of pain.

## VI. ORDER

Defendant's Motion for an Order Affirming the Decision of
the Commissioner [Docket No. 17] is **DENIED**.  The Court remands
this case to the Administrative Law Judge for reconsideration.


　　　　　　　　　　　　　　　　/s/ PATTI B. SARIS
　　　　　　　　　　　　　　　　Patti B. Saris
　　　　　　　　　　　　　　　　United States District Judge